1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  MICHAEL H. PAGE - #154913
   RAGESH K. TANGRI - #159477
3  MARK A. LEMLEY - #155830
   710 Sansome Street
4  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
5  Facsimile:  (415) 397-7188

6  Attorneys for Defendants and Counterclaimants
   HUMMER WINBLAD VENTURE PARTNERS IV, L.P.; and
7  HUMMER WINBLAD TECHNOLOGY FUND IV, L.P.

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12 | IN RE NAPSTER, INC. | Case No. C-MDL-00-1369 (MHP)
   | COPYRIGHT LITIGATION |
13 | |
   | ——————————————————— |
14 | This Document Relates to: |
   | | Case No. C 04-01166 (MHP)
15 | UMG RECORDINGS, INC., et al. |
   | | **HUMMER WINBLAD'S**
16 |     Plaintiffs and Counter-defendants, | **MEMORANDUM OF POINTS AND**
   | | **AUTHORITIES IN SUPPORT OF**
17 |     v. | **OPPOSITION TO PLAINTIFFS'**
   | | **MOTION TO DISMISS**
18 | HUMMER WINBLAD VENTURE | **COUNTERCLAIMS**
   | PARTNERS IV, L.P., et al., |
19 | | Date:  November 22, 2004
   |     Defendants and Counterclaimants. | Time:  2:00 p.m.
20 | | Ctrm:  15 (Hon. Marilyn Hall Patel)

21

22

23

24

25

26

27

28

340726.01

HUMMER WINBLAD'S MPA IN SUPPORT OF OPP. TO PTFS' MTN TO DISMISS COUNTERCLAIMS
Case No. CV-00-1369 (MHP); Case No. C 04-01166 (MHP)

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT .....................................................................................................2

    A.   Relevant Legal Standards Governing The Labels' Motion to Dismiss ..................2

    B.   Under the Labels' Theory of the Case, Hummer Winblad is
       Inextricably Intertwined with the Antitrust Injury They Inflicted on
       Napster in the Market for the Online Distribution of Music .................................3

        1.   The nature of the alleged antitrust injury .....................................................4

        2.   The directness of the injury..........................................................................8

        3.   The speculative measure of the harm, the risk of duplicative
           recovery, and the complexity in apportioning damages ...........................9

    C.   Hummer Winblad Has Standing As a Competitor of the Labels in the
       Market for Financing Online Music Distribution Ventures..................................10

        1.   Hummer Winblad has alleged injury in the market for
           financing online music distribution ventures flowing directly
           from the Labels' anticompetitive conduct ..................................................10

        2.   To invoke Noerr-Pennington immunity, the Labels
           mischaracterize the conduct alleged to have been directed at
           Hummer Winblad and ignore the well-established principle
           that antitrust conspiracies must be judged as a whole ..............................14

    D.   Hummer Winblad Has Standing To Assert Cartwright Act Claims....................17

    E.   Hummer Winblad Has Standing To Assert Section 17200 Claims .....................17

III.  CONCLUSION.................................................................................................18

340726.01

# TABLE OF AUTHORITIES

## FEDERAL CASES

PAGE

Amarel v. Connel,
    102 F.3d 1494 (9th Cir. 1997) .............................................................4, 10, 11, 12, 13

American Ad Mgmt., Inc. v. Central Tel. Co. of California,
    190 F.3d 1051 (9th Cir. 1999) ...................................................................4, 5, 17

Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,
    459 U.S. 519 (1983)...........................................................................................4

Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,
    620 F.2d 1360 (9th Cir. 1980) .........................................................................15

Blue Shield of Virginia v. McCready,
    457 U.S. 465 (1982).................................................................................4, 5, 11

Cahill v. Liberty Mutual Ins. Co.,
    80 F.3d 336 (9th Cir. 1996) ..............................................................................3

Conley v. Gibson,
    355 U.S. 41 (1957).............................................................................................2

Cont'l Ore Co. v. Union Carbide & Carbon Corp.,
    370 U.S. 690 (1962).........................................................................................15

Crimpers Promotions, Inc. v. Home Box Office, Inc.,
    724 F.2d 290 (2nd Cir. 1983)..........................................................................12

Eagle v. Star-Kist Foods, Inc.,
    812 F.2d 538 (9th Cir. 1987) .......................................................................8, 12

Ebay, Inc. v. Bidder's Edge, Inc., 2000 WL 1863564 (N.D. Cal. July 25, 2000)...............3, 10, 15

Gilligan v. Jamco Dev. Corp.,
    108 F.3d 246 (9th Cir. 1997) ............................................................................2

Glen Holly Entm't, Inc. v. Tektronix, Inc.,
    343 F.3d 1000 (9th Cir. 2003) ....................................................................5, 12

Hosp. Bldg. Co. v. Trustees of Rex Hosp.,
    425 U.S. 738 (1976)...........................................................................................2

Hydranautics v. FilmTec,
    70 F.3d 533 (9th Cir. 1995) ............................................................................16

Katz v. Napster,
    C 00-4725 MHP, Mem. & Order (N.D. Cal. July 9, 2001) ...................................13, 16

HUMMER WINBLAD'S MPA IN SUPPORT OF OPP. TO PTFS' MTN TO DISMISS COUNTERCLAIMS
Case No. CV-00-1369 (MHP); Case No. C 04-01166 (MHP)

340726.01

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Knevelbaard Diaries v. Kraft Foods, Inc.,
    232 F.3d 979 (9th Cir. 2000) ...........................................................................9, 15, 17

Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.,
    39 F.3d 951 (9th Cir. 1994) ...................................................................................8, 13

Levy v. Dial Corp., 1997 WL 588925 (N.D. Cal. Sept. 10, 1997) ...............................18

Moore U.S.A. Inc. v. Standard Register Co.,
    139 F. Supp. 2d 348 (W.D.N.Y. 2001) ......................................................................16

Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,
    472 U.S. 284 (1985)....................................................................................................12

Ostrofe v. H.S. Crocker Co., Inc.,
    740 F.2d 739 (9th Cir. 1984) ................................................................................5, 11

Pac. Bell Tel. Co. v. City of Hawthorne,
    188 F. Supp. 2d 1169 (C.D. Cal. 2001) ......................................................................7

Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.,
    508 U.S. 49 (1993)..........................................................................................14, 15, 16

Rissetto v. Plumbers & Steamfitters Local 343,
    94 F.3d 597 (9th Cir. 1996) ........................................................................................8

Sanner v. Bd. of Trade of Chicago,
    62 F.3d 918 (7th Cir. 1995) ......................................................................................13

Schneider v. California Dept. of Corr.,
    151 F.3d 1194 (9th Cir. 1998) .....................................................................................2

USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council,
    31 F.3d 800 (9th Cir. 1994) ......................................................................................14

Usher v. City of Los Angeles,
    828 F.2d 556 (9th Cir. 1987) .......................................................................................2

Vinci v. Waste Mgmt., Inc.,
    80 F.3d 1372 (9th Cir. 1996) ...............................................................................10, 13

Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.,
    951 F.2d 1158 (9th Cir. 1991), cert. denied, 504 U.S. 913 (1992) .............................13

**STATE CASES**

Cellular Plus, Inc. v. Superior Court,
    14 Cal. App. 4th 1224 (1993) .....................................................................................17

**FEDERAL STATUTES**

Federal Rule of Civil Procedure 15(a) ..........................................................................18

340726.01

**STATE STATUTES**

California Business and Professions Code Section 16750(a) ........................................................17

California Business and Professions Code Section 17200 ...............................................2, 17, 18

**MISCELLANEOUS**

Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 375d (2d ed. 2000)........................................................12

340726.01

## I.    INTRODUCTION

Plaintiffs UMG and EMI (hereinafter, the "Labels") opposed Hummer Winblad's motion to dismiss their contributory and vicarious copyright infringement claims by arguing that Hummer Winblad exercised "iron-clad control" over Napster, and indeed was the "driving force" behind it.  In doing so, they persuaded this Court to give them the opportunity to prove at trial that Hummer Winblad was so inextricably intertwined with Napster that Hummer Winblad was effectively Napster's alter ego, and so should share in its alleged secondary liability. Remarkably, in order to overcome Hummer Winblad's antitrust counterclaims, the Labels now do an about-face and claim that Hummer Winblad's interests are so remote from Napster's that one must concoct a four-step "domino effect" theory to connect the two.

But the Labels cannot and should not have it both ways.  Proof that an antitrust plaintiff's interests are "inextricably intertwined" with the market in which the antitrust violation occurs suffices to show antitrust injury for standing purposes.  Under the Labels' theory of the case, and the current state of facts that could be proven at trial, Hummer Winblad was inextricably intertwined with the antitrust injury the Labels inflicted on Napster in the market for online music distribution.  But even if that claim were to fail, Hummer Winblad has standing on a separate basis.  As the counterclaim alleges, the Labels were out to eliminate not only online music distribution competitors, but also those like Hummer Winblad who would supply them with independent sources of capital.  Hummer Winblad's allegations describe the Labels' targeting the closely related market for financing online music distribution ventures.  Their attacks on financing are bound up with their efforts to control online music distribution—trying to dry up potential funds for start-ups in this market was a necessary and integral part of their broader anticompetitive scheme.  Hummer Winblad suffered injury in that market as well, and has standing to redress it under clear Ninth Circuit precedent.

Hummer Winblad's allegations are more than sufficient to put the Labels on notice of its injury in either market.  The Labels can raise standing issues only by improperly disaggregating the conspiracy allegations of the counterclaim into their component parts, rather than treating them as an integrated whole as the law requires, and by ignoring entirely three of the five factors

1   the Supreme Court considers in deciding antitrust injury cases.

2          Finally, the Labels blithely assert that Hummer Winblad's Cartwright Act and Section

3   17200 claims stand or fall with its Sherman Act claims.  This is false.  The Cartwright Act, and

4   particularly California Business and Professions Code Section 17200, have far more lenient

5   standing requirements than the federal antitrust injury doctrine.  Even if the Labels could

6   persuade this Court that antitrust injury was lacking, there can be no serious question that

7   Hummer Winblad has suffered at least the minimal injury in fact that Article III requires and that

8   suffices to satisfy Section 17200.

9                              **II.    ARGUMENT**

10  **A.    Relevant Legal Standards Governing The Labels' Motion to Dismiss**

11         Hummer Winblad's[1] antitrust counterclaims cannot be dismissed for failure to state a

12  claim "unless it appears beyond doubt that [Hummer Winblad] can prove no set of facts in

13  support of [its] claim which would entitle [it] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46

14  (1957).  The Court "must presume all factual allegations of the [counterclaim] to be true and

15  draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles,

16  828 F.2d 556, 561 (9th Cir. 1987).  "It is axiomatic that the motion to dismiss for failure to state

17  a claim is viewed with disfavor and is rarely granted."  Gilligan v. Jamco Dev. Corp., 108 F.3d

18  246, 249 (9th Cir. 1997).  This is particularly true in the antitrust context.  Because of the

19  conspiratorial nature of certain antitrust claims, "dismissals prior to giving the plaintiff ample

20  opportunity for discovery should be granted sparingly."  Hosp. Bldg. Co. v. Trustees of Rex

21  Hosp., 425 U.S. 738, 746 (1976).

22         Because Rule 12(b)(6) tests the legal sufficiency of the claim rather than its substantive

23  merits, the Court "*may not* look beyond" the pleadings in ruling on the Labels' motion.

24  Schneider v. California Dept. of Corr., 151 F.3d 1194, 1197 (9th Cir. 1998) (emphasis in

25  original).  Ignoring this well-settled rule, the Labels' motion introduces multiple "facts" that fall

26  outside the pleadings (including some that directly contradict them), and thus must be

27  _____

28  [1] As used herein, "Hummer Winblad" refers to counterclaimants Hummer Winblad Venture
    Partners IV, L.P. and Hummer Winblad Technology Fund IV, L.P.

2
HUMMER WINBLAD'S MPA IN SUPPORT OF OPP. TO PTFS' MTN TO DISMISS COUNTERCLAIMS
Case No. CV-00-1369 (MHP); Case No. C 04-01166 (MHP)

340726.01

1  disregarded at this stage.  For example, they note that the Department of Justice's Antitrust

2  Division closed its investigation of pressplay and MusicNet in December 2003,[2] and claim that

3  another Hummer Winblad portfolio company entered into a licensing arrangement for the

4  distribution of music from the major record labels.  See Pls.' Mem. at 2-3.  Hummer Winblad

5  requests that these references and the corresponding extrinsic evidence the Labels have

6  submitted be stricken from the Labels' motion.  See Pls.' Mem. at 2:21-3:1 and 3:8-14; Exhs. A

7  & B.  Whatever questions may be raised by these purported facts must be left for resolution upon

8  motions for summary judgment or at trial.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38

9  (9th Cir. 1996); see also Ebay, Inc. v. Bidder's Edge, Inc., 2000 WL 1863564 at *3 (N.D. Cal.

10  July 25, 2000) (arguments regarding merits of allegations in antitrust counterclaim not

11  appropriately resolved on motion to dismiss).

**B.  Under the Labels' Theory of the Case, Hummer Winblad is Inextricably Intertwined with the Antitrust Injury They Inflicted on Napster in the Market for the Online Distribution of Music**

14  Hummer Winblad has alleged facts in its counterclaim that support two different theories

15  of injury.  First, Hummer Winblad is entitled to an opportunity to show that its injury was

16  "inextricably intertwined" with Napster's injury, and therefore that it can stand in the shoes of

17  Napster in challenging the Labels' antitrust violations in the market for online music distribution.

18  Second, Hummer Winblad has alleged that it participated in the market for financing online

19  music distribution ventures and that it was injured in that market by the Labels' antitrust

20  violations directed at that market.  The Labels' motion should be denied if either theory states a

21  possible cause of action.

22  The antitrust standing inquiry is highly contextual.  Courts look to a number of factors to

23  determine whether a claimant who has borne an injury has antitrust standing to pursue an award

---

[2] The decision of the Department of Justice to close its investigation was based in large part on its conclusion that the Labels have now authorized non-controlled entities to deliver their music content online in digital form.  The fact that the digital music distribution landscape may be different today certainly does not mean that the Labels were not engaged in anticompetitive conduct during the time period alleged in the counterclaim.  Indeed, to the extent the closing of the Department of Justice's investigation has any relevance at this stage, it is to underscore the fact that denying Hummer Winblad standing will leave significant antitrust violations unremedied.

340726.01

1  of damages under Section 4 of the Clayton Act.  These factors include:  (1) the nature of the

2  alleged injury, that is, whether it is the type the antitrust laws were intended to forestall; (2) the

3  directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative

4  recovery; and (5) the complexity in apportioning damages.  See Associated Gen. Contractors of

5  California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535 (1983).  "To

6  conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each

7  factor."  American Ad Mgmt., Inc. v. Central Tel. Co. of California, 190 F.3d 1051, 1055 (9th

8  Cir. 1999).  Instead, the Ninth Circuit urges a balancing of the factors.  Id. (citing R.C. Dick

9  Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 146 (9th Cir. 1989) (en banc)).  No

10  single factor is decisive, but courts give great weight to the nature of the alleged injury.  See

11  Amarel v. Connel, 102 F.3d 1494, 1507 (9th Cir. 1997).  Each of these factors compels the

12  conclusion that Hummer Winblad has standing under the antitrust laws to assert injury in the

13  online music distribution market.

14         1.      The nature of the alleged antitrust injury

15         In light of this Court's ruling denying Hummer Winblad's motion to dismiss the Labels'

16  complaint, there is at least a possible state of affairs under which Hummer Winblad was

17  "inextricably intertwined" with Napster and therefore has standing to assert injury that resulted

18  from the Labels' antitrust violations against it.  The principle of "inextricably intertwined" injury

19  derives from the decision of the United States Supreme Court in Blue Shield of Virginia v.

20  McCready, 457 U.S. 465 (1982).  In that case, plaintiff McCready was a member of an

21  employer-purchased Blue Shield group health insurance plan.  McCready alleged that the insurer

22  had entered into a conspiracy with psychiatrists to restrain competition in the psychotherapy

23  market by excluding clinical psychologists from receiving compensation under Blue Shield

24  health plans.  McCready, 457 U.S. at 469-70.  McCready claimed she suffered antitrust injury

25  when Blue Shield refused to reimburse her for treatment by a psychologist.

26         The Court found McCready to have standing.  It rejected the argument of the McCready

27  petitioners that McCready's injury was too remote because the alleged conspiracy was directed

28  at psychologists rather than subscribers to the group health plans.  Id. at 478-79.  McCready was

4
HUMMER WINBLAD'S MPA IN SUPPORT OF OPP. TO PTFS' MTN TO DISMISS COUNTERCLAIMS
Case No. CV-00-1369 (MHP); Case No. C 04-01166 (MHP)

340726.01

1   not a competitor of the conspirators.  Rather, the Court viewed her as a "consumer of

2   psychotherapy services entitled to financial benefits under the Blue Shield plan."  Id. at 480.

3   Since the conspiracy aimed to deprive psychologists of the patronage of Blue Shield subscribers,

4   denying reimbursement to McCready was "a necessary step in effecting the ends of the

5   conspiracy" and was "integral" to its success.  Id. at 479.  On that basis, the Court held that "the

6   injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict

7   on psychologists and the psychotherapy market."  Id. at 484.

8        The Ninth Circuit applied McCready to reach a similar result in Ostrofe v. H.S. Crocker

9   Co., Inc., 740 F.2d 739 (9th Cir. 1984).  There, plaintiff Ostrofe, who served as defendant's

10   marketing director, refused to perform activities in support of an alleged conspiracy to restrain

11   trade in the market for paper lithograph labels.  Ostrofe was then terminated and boycotted from

12   further employment in the industry.  He filed suit under Section 4 of the Clayton Act alleging

13   that he had been discharged because of his refusal to participate in defendant's scheme.  Ostrofe,

14   740 F.2d at 741-42.  Ostrofe was neither a competitor nor consumer in the labels market; indeed,

15   he did not participate in that market other than by virtue of his employment.  But the Ninth

16   Circuit held that he had antitrust standing because "his discharge was a necessary means to

17   achieve the conspirators' illegal end as well as an integral and inextricable part of the

18   anticompetitive scheme."  Id. at 746.  See also Glen Holly Entm't, Inc. v. Tektronix, Inc., 343

19   F.3d 1000, 1013-14 (9th Cir. 2003) (injury to competitor "inextricably intertwined" with

20   anticompetitive joint venture agreement between manufacturers); American Ad Mgmt., 190 F.3d

21   at 1058 ("[I]t is not the status as a consumer or competitor that confers antitrust standing, but the

22   relationship between the defendant's alleged unlawful conduct and the resulting harm to the

23   plaintiff.").

24        Hummer Winblad's counterclaim alleges in detail the means by which the Labels' sought

25   and conspired to restrain trade in the online music distribution market.  For example, Hummer

26   Winblad alleges, among other things, that the Labels and their coconspirators formed MusicNet

27   and pressplay to serve as the exclusive vehicles through which they would license music content

28   for online distribution; Counterclaim ¶ 23; that the Labels and their coconspirators concertedly

refused to license any online distribution of their copyrighted works by any entity other these two captive joint ventures; id. ¶ 24; that specific provisions of the MusicNet/Napster Distribution Agreement imposed unduly restrictive and coercive licensing terms, since for example Napster was required to use MusicNet in order to gain access to Sony and Universal (i.e., pressplay) recordings; id. ¶¶ 24a-d; that the Labels and their coconspirators used MusicNet and pressplay to pool their copyrights to effect a price-fixing arrangement among horizontal competitors, which resulted in excessive wholesale prices for retailers and higher average prices for consumers; id. ¶ 25; and that the Labels and their coconspirators used MusicNet and pressplay as conduits for colluding to fix prices for licenses.  Id. ¶ 26; see also id. at ¶¶ 32-34 (detailing collusive licensing behavior).

The nature of Hummer Winblad's injury in the online distribution market must be analyzed in the context of the Labels' own copyright liability allegations, about which their motion is conspicuously silent.  The Labels' entire theory of their case depends on the central premise that Hummer Winblad exerted "essentially full" dominion and control over Napster and its operations and activities, so that Hummer Winblad effectively stood in the shoes of Napster and shared responsibility for its alleged contributory and vicarious copyright infringement.  See, e.g., Complaint ¶¶ 23-24, 34, 38-40.  Hummer Winblad disagrees with this factual premise, and filed a motion to dismiss arguing that its status as an investor in Napster was insufficient to impose liability on it for the allegedly infringing acts of others.[3]  The Labels opposed that motion by arguing that their allegations with respect to Hummer Winblad went far beyond mere shareholder status.  Indeed, they hinged liability on what they described as Hummer Winblad's "exercising *iron-clad control over Napster* and its infringing operations" on a daily basis.  Pls.' Mem. in Opposition to Motion to Dismiss (January 16, 2003) at 1 (emphasis added); see also id. at 11, 16 (arguing Hummer Winblad took and exercised control over "Napster's day-to-day

---

[3] Hummer Winblad wishes to make it clear that it continues to believe the facts will ultimately show that it was not effectively an alter ego of Napster subject to copyright liability.  But since this Court has already held that there is some state of affairs under which Hummer Winblad could be treated as Napster's alter ego, and that the Labels have alleged just that state of affairs to be true, it would be inequitable in the extreme to dismiss Hummer Winblad's counterclaim based on precisely that same alleged state of affairs.

1   operations and decision-making," describing Hummer Winblad as the "driving force" behind

2   Napster, and stating that Hummer Winblad "took over every aspect of Napster's management").

3   That very argument ultimately won the day, as this Court found that rather than alleging

4   Hummer Winblad had merely supplied Napster with necessary funding, the Labels had

5   specifically accused Hummer Winblad of "exercis[ing] essentially full operational control over

6   Napster." <u>See</u> July 14, 2004 Mem. & Order Re: Defendants' Motion to Dismiss at 7-9.[4]  Thus,

7   under the Labels' theory of the case, this Court found that the Labels might be able to show at

8   trial that Hummer Winblad was sufficiently inextricably intertwined with Napster for copyright

9   liability purposes.

10          What's sauce for the goose is sauce for the gander.  Given the set of facts the Labels have

11  pled and that the Court has ruled sufficient to state a claim for contributory and vicarious

12  liability, there can be no doubt that the injury Hummer Winblad suffered is "inextricably

13  intertwined" with the injury the Labels sought to inflict on Napster.  Whereas to find Hummer

14  Winblad liable on the Labels' copyright theory will require a finding of a degree of entanglement

15  and control that effectively renders Hummer Winblad an alter ego of Napster, the concept of

16  "inextricably intertwined" for antitrust standing is broader; it requires only a sufficient nexus

17  between the injury suffered and the nature of the anticompetitive conduct—viewed as a whole—

18  and the means used to achieve it.  After all, no one would claim that Ms. McCready was an alter

19  ego of her psychologist.  If the Labels ultimately prevail on their copyright liability theories,

20  Hummer Winblad's injury will have flowed directly from the unlawful conduct in which the

21  Labels engaged to stifle the online distribution market.  Indeed, the connection between the

22  Labels' antitrust violations and Hummer Winblad's injury will be even closer than that between

23  the conspiracies in <u>McCready</u> and <u>Ostrofe</u> and the denial of Ms. McCready's claim or the loss of

24  Mr. Ostrofe's job.  If, as the Labels argue, Hummer Winblad is sufficiently inextricably

25  intertwined with Napster for purposes of copyright liability, that is more than enough to confer

26  antitrust standing on Hummer Winblad.

27

28  [4] The Court may take judicial notice of these court filings and pleadings.  <u>See</u> <u>Pacific Bell Tel.</u>
    <u>Co. v. City of Hawthorne</u>, 188 F. Supp. 2d 1169, 1172 (C.D. Cal. 2001).

1   The Labels' theories, and the arguments they advanced to survive Hummer Winblad's

2   motion to dismiss, take Hummer Winblad's antitrust claims out of the realm of cases the Labels

3   rely on in which standing was denied because it was premised on a mere commercial relationship

4   with a market participant.  See, e.g., Eagle v. Star-Kist Foods, Inc., 812 F.2d 538 (9th Cir. 1987);

5   Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co., 39 F.3d 951 (9th Cir. 1994).  If all that

6   were at issue here was a commercial relationship or financial interest—that is, simply Hummer

7   Winblad's investment in Napster—then the Labels' complaint would have already been

8   dismissed.  Instead, under the current state of affairs in the litigation, Hummer Winblad stands in

9   a markedly different position than parties who could only claim a financial interest in preventing

10  the Labels' anticompetitive behavior, such as "Napster users who wanted to access online

11  distribution services, artists who may have wanted their music distributed online through

12  Napster, landlords who wanted to rent space to Napster, or computer manufacturers who wanted

13  to sell Napster servers."  Pls.' Mem. at 12.

14   Indeed, having argued this set of facts before this Court and prevailed at the pleadings

15  state, the Labels are judicially estopped from now taking an inconsistent position.  The doctrine

16  of judicial estoppel "precludes a party from gaining an advantage by taking one position, and

17  then seeking a second advantage by taking an incompatible position."  Rissetto v. Plumbers &

18  Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996) (plaintiff who obtained favorable

19  workers' compensation settlement based on assertion that she could not work judicially estopped

20  from asserting legal claims based on ability to work).  That would be precisely the effect if the

21  Labels, having persuaded this Court that Hummer Winblad might factually be inextricably

22  intertwined with Napster in order to advance their copyright claims, could also persuade this

23  Court that Hummer Winblad could *never* be considered inextricably intertwined with Napster in

24  order to advance its antitrust dismissal motion.

25   The "nature of the injury" factor therefore favors a finding that Hummer Winblad has

26  antitrust standing.

27       **2.**       **The directness of the injury**

28   For the same reasons, the Labels' claim that Hummer Winblad's injury is too indirect to

8

HUMMER WINBLAD'S MPA IN SUPPORT OF OPP. TO PTFS' MTN TO DISMISS COUNTERCLAIMS
Case No. CV-00-1369 (MHP); Case No. C 04-01166 (MHP)

1   support standing must fail.  The Labels assert that Hummer Winblad has proffered a four-step

2   "domino-effect" theory.  See Pls.' Mem. at 13.  The theory the Labels have concocted is indeed

3   attenuated, and might raise an issue about the directness of Hummer Winblad's injury if it were

4   in fact Hummer Winblad's theory.  But it is not.  Rather, Hummer Winblad simply alleges that if

5   the Labels had permitted fair competition in the market for online music distribution, Napster

6   would still be in existence and Hummer Winblad would not have lost its entire investment.

7   Given the Labels' theory of the case—that Hummer Winblad was essentially Napster's alter

8   ego—Hummer Winblad was the immediate victim of their antitrust violations.  This is

9   particularly so since, as Hummer Winblad has alleged, the injury it sustained in the upstream

10  financing market was a necessary means for the Labels to achieve their illegal end and was an

11  integral and inextricable part of their anticompetitive scheme.  See infra Section II.C.1.

12          **3.      The speculative measure of the harm, the risk of duplicative recovery, and
                       the complexity in apportioning damages**

13          The Labels' motion is silent on the remaining three Associated General Contractors

14  factors, and with good reason.  There is no plausible argument that any of these three factors cuts

15  against finding antitrust injury.  First, there is noting speculative about the harm Hummer

16  Winblad has suffered.  Hummer Winblad alleges that as a result of the Labels' anticompetitive

17  conduct, it lost its $13 million investment in Napster.  Counterclaim ¶ 36.  That amount is readily

18  calculable.  Nor would there be any problem or complexity in apportioning Hummer Winblad's

19  damages.  Since that factor comes into play only when "multiple classes or layers of claimants

20  seek, or might seek, compensation," it is totally absent here, where Napster is no longer in

21  existence.  Knevelbaard Diaries v. Kraft Foods, Inc., 232 F.3d 979, 992 (9th Cir. 2000).  Lastly,

22  there is no risk of duplicative recovery.  As Hummer Winblad alleges, Napster filed for

23  bankruptcy protection and its assets were purchased by Roxio, Inc.  At the same time, plaintiff

24  UMG and one of its coconspirators, Sony Music, made substantial investments in Roxio, thereby

25  gaining stock and board positions that effectively transferred control of Napster to them.

26  Counterclaim ¶ 35.  Even the Labels, with their aggressive litigation strategy, would presumably

27  stop short of suing themselves for antitrust damages.  Each of these factors weighs in favor of

28

9

340726.01

1    finding that Hummer Winblad has standing.

2    **C.   Hummer Winblad Has Standing As a Competitor of the Labels in the Market for Financing Online Music Distribution Ventures**

3    **1.   Hummer Winblad has alleged injury in the market for financing online music distribution ventures flowing directly from the Labels' anticompetitive conduct**

5    The Labels' attempts to defeat Hummer Winblad's standing based on the injury it

6    suffered in the market for financing online music distribution companies fare no better.  Hummer

7    Winblad alleges that the Labels and their coconspirators participated in the market for financing

8    online distribution ventures, and that Hummer Winblad participated in and competed with them

9    in that market.  Counterclaim ¶¶ 37-39.  Those allegations alone suffice to confer antitrust

10   standing.  Ebay, Inc. v. Bidder's Edge, Inc., 2000 WL 1863564 at *2 (N.D. Cal. July 25, 2000)

11   ("an allegation of market participation is sufficient to confer antitrust standing for pleading

12   purposes").

13   The Labels do not dispute these allegations.  Rather, they argue that Hummer Winblad

14   claims injury in that market simply as a shareholder of Napster, in order to shoehorn Hummer

15   Winblad's allegations into the rule that a shareholder of a corporation injured by antitrust

16   violations lacks standing to sue in his or her own name.  See, e.g., Vinci v. Waste Mgmt., Inc.,

17   80 F.3d 1372, 1375 (9th Cir. 1996); Pls.' Mem. at 14-15.  But the Labels fundamentally

18   misconstrue the nature of Hummer Winblad's injury.  Hummer Winblad alleges that the Labels

19   specifically targeted the financing market in order to dry up the funds for those who, like

20   Napster, would directly compete with them in the market for the online distribution of recorded

21   music.  Counterclaim ¶ 39.  Hummer Winblad's injury flows not from mere shareholder status,

22   but rather from the Labels' concerted efforts to cut off access to and freeze out other, unaffiliated

23   (i.e., non-label) financing for new online distribution companies.  In other words, the injury

24   Hummer Winblad alleges here is not derivative of the anticompetitive harm directed to Napster;

25   Hummer Winblad was its immediate and intended victim.  Such a direct relationship between

26   Hummer Winblad's injury and the Labels' antitrust violations confers antitrust standing.  See,

27   e.g., Amarel v. Connel, 102 F.3d 1494, 1512-13 (9th Cir. 1997).  The Labels' exclusive reliance

28

10

on typical shareholder standing cases is therefore misplaced.

The fact that the Labels' targeting of the upstream financing market was integral to their conspiracy aimed at the related and interdependent market for online music distribution only strengthens Hummer Winblad's antitrust standing. Hummer Winblad specifically alleges that the Labels knew their conspiracy to cartelize the market for online music distribution would be undermined by the availability of independent sources of private financing for companies trying to enter into and/or compete in that market. Counterclaim ¶ 38. As a result, Hummer Winblad alleges that the Labels directed their anticompetitive scheme and conduct to the upstream market for the investment in and financing of online music distribution ventures. Id. Those allegations, taken as true as they must be on a motion to dismiss, are sufficient to confer standing on Hummer Winblad. See McCready, 457 U.S. at 479 ("Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss" that the antitrust laws were intended to forestall); Ostrofe, 740 F.2d at 745 (right to sue for antitrust injury extends to those "whose injury is a 'necessary step' and the 'means' employed by the conspirators to achieve their anticompetitive end").

Courts in the Ninth Circuit have not hesitated to find antitrust standing under similar circumstances. For example, in Amarel, independent rice farmers grew California rice, harvested it in "rough" or "paddy" form, and sold it to a handful of independent rice mills. The independent rice mills then milled the rice and sold it in milled form. The independent rice growers sold their paddy rice to the mills through "participation contracts" under which they shared profits from the sale of the milled rice. Amarel, 102 F.3d at 1500. Plaintiffs alleged a Sherman Act Section 1 conspiracy among the defendants to eliminate independent rice purchasers and independent rice mills from the market for milled California rice, and to eliminate independent growers of California paddy rice by driving the growers from the market or forcing them to become members of one of the rice cooperatives. Id. at 1503. Like the Labels here, the Amarel defendants claimed that that the independent rice growers lacked standing because their injury was not the type the antitrust laws were intended to prevent, and that their alleged injury was derivative of the injury to the rice mills and therefore not cognizable under the

1    antitrust laws.  The court easily rejected that argument.

2         First, with respect to the nature of plaintiffs' alleged injury, the court noted that a critical

3    component of defendants' alleged anticompetitive conduct—the refusal to sell rice to

4    independent rice mills—was allegedly directed at both the independent farmers and the

5    independent mills, which was consistent with defendants' "broader aim" of eliminating

6    independent entities in the California rice industry.  Id. at 1511.[5]  The resulting harm to

7    competition created cognizable antitrust injury to the independent farmers.  See also Northwest

8    Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 294 (1985)

9    (concerted refusals to deal may "cut off access to a supply, facility or market necessary to

10   enable" the targeted firm to compete); Glen Holly Entm't, 343 F.3d at 1014 (antitrust injury

11   adequately alleged for pleading purposes where allegation of "loss stems from a competition-

12   reducing aspect or effect" of challenged behavior) (citation omitted).  So too here.  Hummer

13   Winblad has alleged that the Labels' refusal to deal and other collusive, anticompetitive actions

14   vis-à-vis Napster were directed at both Napster and Hummer Winblad, and were part of their

15   broader aim of eliminating competition from independent online music distribution companies

16   and independent companies who could or did provide them with an upstream supply of capital.

17   Counterclaim ¶¶ 23-26; 32-34; 37-41; 43.  Like the Amarel plaintiffs, Hummer Winblad has

18   suffered antitrust injury.  See also Crimpers Promotions, Inc. v. Home Box Office, Inc., 724 F.2d

19   290, 294-295 (2nd Cir. 1983) (Friendly, J.) (plaintiff trade show organizer had antitrust standing

20   where it "endeavor[ed] to forge a link in a chain of the sale of cable television programming …

21   that would compete with defendants in their role as middlemen"; plaintiff's injury was

22   "inextricably intertwined with the injury the defendants sought to inflict on producers and

23   television stations in the cable television market."); Areeda & Hovenkamp, Antitrust Law ¶ 375d

24   (2d ed. 2000) (standing appropriate where supplier "both competes with defendants and is their

25   target").

26

27   [5] On this basis, the court specifically distinguished Eagle v. Star-Kist Foods, Inc., 812 F.2d 538 (9th Cir. 1987), upon which the Amarel defendants and the Labels here heavily relied.  In Eagle,

28   the canneries allegedly directed their anticompetitive conduct at the fishing vessel owners only, rather than at the plaintiff-crewmembers themselves.  See Amarel, 102 F.3d at 1511.

1   Second, the court held that plaintiffs had suffered a "direct" antitrust injury because of

2   the close relationship between the paddy rice market and the milled rice market.  Amarel, 102

3   F.3d at 1512-13 (citing Sanner v. Bd. of Trade of Chicago, 62 F.3d 918, 927-29 (7th Cir. 1995)

4   (plaintiff farmers who were sellers in soybean cash market had antitrust standing where injury

5   flowed from unlawful action in closely related soybean futures market)).  The Amarel defendants

6   allegedly intended to have an impact on both of those markets.  And given the interdependence

7   between independent mills and independent farmers, "injuring the farmers was thus an 'integral

8   aspect of the conspiracy alleged.'"  Amarel, 102 F.3d at 1512 (quoting McCready, 457 U.S. at

9   479).[6]

10   The facts here are strikingly similar.  Hummer Winblad specifically alleges that the

11   market for online music distribution companies and the market for financing such ventures were

12   closely related and interdependent, and that the Labels targeted their anticompetitive acts at both

13   markets.  Hummer Winblad's injury is therefore sufficiently direct to support a finding of

14   antitrust standing.  See, e.g., Sanner, 62 F.3d at 929 (intent to harm soybean futures market could

15   suggest intent to harm soybean cash market); Yellow Pages Cost Consultants, Inc. v. GTE

16   Directories Corp., 951 F.2d 1158, 1162-63 (9th Cir. 1991), cert. denied, 504 U.S. 913 (1992)

17   (close link between yellow pages publisher defendants' refusal to allow yellow pages consulting

18   firm plaintiffs to process customer advertisements, and plaintiffs' loss of customers, sufficient to

19   confer antitrust standing).

20   Further, Hummer Winblad has also alleged that the filing of the instant lawsuit is in

21   furtherance of and evidences the Labels' efforts to target the market for financing online music

22   distribution ventures.  Counterclaim ¶ 41.  The Labels' copyright theory of "tertiary liability" is

23   legally unprecedented, and indeed the only similar claim to have been asserted was rejected by

24   this Court.  See Katz v. Napster, C 00-4725 MHP, Mem. & Order (N.D. Cal. July 9, 2001)

25

26   [6] In concluding that plaintiffs were sufficiently direct victims of defendants' anticompetitive activities, the Amarel court expressly distinguished the Ninth Circuit cases principally relied on

27   by the Labels here where injuries were held to be too indirect to support standing, such as Vinci v. Waste Mgmt., Inc., 80 F.3d 1372 (9th Cir. 1996) and Legal Econ. Evaluations, Inc. v. Metro.

28   Life Ins. Co., 39 F.3d 951 (9th Cir. 1994), cert. denied, 514 U.S. 1044 (1995).  See Amarel, 102 F.2d at 1513; Pls.' Mem. at 10-11, 15.

(Patel, C.J.).  Hummer Winblad has alleged that the suit was brought not because of any legitimate expectation of success, but because the very filing of the suit would chill venture capital investment in online music distribution ventures.  Counterclaim ¶ 41.  If there were any remaining question whether the Labels' conduct were sufficiently directed at Hummer Winblad itself, rather than merely Napster, this lawsuit should settle the matter conclusively.

> **2.**      **To invoke <u>Noerr-Pennington</u> immunity, the Labels mischaracterize the conduct alleged to have been directed at Hummer Winblad and ignore the well-established principle that antitrust conspiracies must be judged as a whole**

The Labels erroneously state that the only conduct alleged to have been directed at Hummer Winblad is the filing of the instant lawsuit.  <u>See</u> Pls.' Mem. at 16.  By doing so, they hope to bring this case within the ambit of the <u>Noerr-Pennington</u> doctrine, which provides immunity for the filing of lawsuits unless they are shams.  <u>Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.</u>, 508 U.S. 49 (1993).  There are two problems with this theory.

First, as just discussed in the prior section, Hummer Winblad in fact alleges a range of anticompetitive conduct by the Labels against it, of which this lawsuit is only a part.  Hummer Winblad's allegations make clear that the filing of this lawsuit "constitutes the most recent act" in furtherance of the Labels' anticompetitive scheme, above and beyond the multiple acts alleged to have been part of their design to cartelize the online distribution market and to freeze out independent sources of private financing for companies trying to enter into and compete in that market.  <u>See</u> Counterclaim ¶¶ 24-26, 32-34, 37-41; 43.  Since this lawsuit is alleged, in combination with multiple other acts, to have been part of the Labels' policy and purpose of injuring its market rivals, Ninth Circuit precedent suggests that <u>Professional Real Estate Investors</u> is inapplicable.  <u>See</u> <u>USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council</u>, 31 F.3d 800, 810-11 (9th Cir. 1994) (<u>Professional Real Estate Investors</u> sham standard does not apply when plaintiffs allege a course of conduct beyond the filing of a single lawsuit).

The Labels seek to avoid this inconvenient fact by disaggregating Hummer Winblad's antitrust claims into their component parts.  When they wish to characterize the injury in the

14

1    financing market as just a shareholder claim, they ignore the filing of the lawsuit.  When they

2    wish to characterize the injury as just the filing of a lawsuit, they ignore the range of other

3    conduct directed at Hummer Winblad in the financing market.  But antitrust law does not permit

4    courts to ignore the forest by focusing on only one tree at a time.  Instead, since "antitrust

5    conspiracies frequently entail multiple means and objectives … [t]he law requires that every

6    conspiracy be judged as a whole."  Knevelbaard Diaries v. Kraft Foods, Inc., 232 F.3d 979, 990-

7    991 (9th Cir. 2000); see also Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690,

8    699 (1962) (antitrust plaintiffs "should be given the full benefit of their proof without tightly

9    compartmentalizing the various factual components and wiping the slate clean after scrutiny of

10   each.  The character and effect of a conspiracy are not to be judged by dismembering it and

11   viewing its separate parts, but only by looking at it as a whole.") (citations and internal

12   quotations omitted); Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1365-66

13   (9th Cir. 1980) (same).  When judged in its proper context, the fact that Hummer Winblad has

14   alleged the existence of a lawsuit as one part of a broader conspiracy to target the financing of

15   online music distribution ventures does not subject the whole claim to the standards of the Noerr-

16   Pennington doctrine.  See Ebay, Inc. v. Bidder's Edge, Inc., 2000 WL 1863564 at *2 (N.D. Cal.

17   July 25, 2000) (antitrust counterclaim cannot be dismissed at pleadings stage under Noerr-

18   Pennington where "at least some" of the allegedly anticompetitive conduct is unrelated to any

19   protected activity; "appropriate means for eliminating insufficient theories of liability is a motion

20   for partial summary adjudication").

21        Alternatively, even if Hummer Winblad's allegations were subject to Noerr-Pennington,

22   Hummer Winblad has adequately pled facts that bring this suit within the "sham" exception to

23   that doctrine.  The sham exception to Noerr-Pennington does not apply unless the antitrust

24   claimant establishes that the underlying suit is both objectively baseless and subjectively brought

25   for an improper purpose.  Prof'l Real Estate Investors, 508 U.S. at 60-61.  On its face, Hummer

26   Winblad's counterclaim alleges that the Labels' underlying lawsuit is objectively baseless.

27   Counterclaim ¶ 41.  That alone should suffice to resolve the issue.  The Labels claim that their

28   lawsuit could not have been objectively baseless because this Court found that "rampant

15

1    copyright infringement occurred on the Napster system." Pls.' Mem. at 18. But that provided

2    the Labels only with a reasonable basis to assert claims against *Napster*, not Hummer Winblad.

3    Hummer Winblad is unaware of a litigant ever prevailing on a theory of tertiary copyright

4    infringement liability. Indeed, this Court threw out such a claim in the original Napster

5    litigation. See Katz v. Napster, C 00-4725 MHP, Mem. & Order (N.D. Cal. July 9, 2001) (Patel,

6    C.J.). There is nothing in the underlying Napster litigation that establishes as a matter of law that

7    this unprecedented tertiary liability claim is well founded in fact and law.

8         The Labels next argue that this Court's denial of Hummer Winblad's motion to dismiss

9    proves that their lawsuit cannot be baseless. But that proves too much. If surviving a motion to

10   dismiss were some sort of "objectively baseless" safe harbor, then every sham litigation

11   counterclaim would get thrown out, since by definition those counterclaims are filed only once

12   the plaintiff has survived any motion to dismiss and the case is at issue. That cannot be the rule,

13   since counterclaims alleging sham litigation often proceed to discovery and even to trial. See,

14   e.g., Hydranautics v. FilmTec, 70 F.3d 533, 537-38 (9th Cir. 1995) (properly pled sham

15   exception claim presents fact questions which must be decided by a jury, even though patentee

16   *won* the suit alleged to be a sham in district court and lost only on appeal); Moore U.S.A. Inc. v.

17   Standard Register Co., 139 F. Supp. 2d 348, 359-60 (W.D.N.Y. 2001) (allegation in antitrust

18   counterclaim that plaintiff filed suit in bad faith against a product it knew did not infringe

19   sufficient to state a claim for sham litigation). Taking Hummer Winblad's allegations as true,

20   this Court must accept for purposes of this motion that the Labels' lawsuit is objectively

21   baseless.

22        Hummer Winblad has also satisfied the second part of the Professional Real Estate

23   Investors test by alleging improper motivation. Hummer Winblad has specifically alleged that

24   the Labels' lawsuit was "asserted as an anticompetitive weapon" and was part of its design to

25   "eliminate independent and competitive capital investment in online distribution ventures by

26   Hummer Winblad, and to intimidate others from doing the same." Counterclaim ¶ 41. At the

27   pleading stage, that is sufficient to establish that the Labels' subjective motivation was to

28   "attempt to interfere directly with the business relationships of a competitor." Prof'l Real Estate

1  Investors, 508 U.S. at 60-61.

2  **D.   Hummer Winblad Has Standing To Assert Cartwright Act Claims**

3         The Labels' only challenge to the adequacy of Hummer Winblad's Cartwright Act claim

4  is predicated entirely on their challenge to Hummer Winblad's Sherman Act claim.  Pls.' Mem.

5  at 20.  But even if Hummer Winblad lacked federal antitrust standing to state a Sherman Act

6  Section 1 claim (which it does not), it still has standing on separate and independent grounds

7  under California law, which, as the Ninth Circuit has recognized, affords antitrust standing

8  "more liberally" than does federal law.  Knevelbaard Diaries v. Kraft Foods, Inc., 232 F.3d 979,

9  987 (9th Cir. 2000) (milk producers had standing under Cartwright Act in connection with

10 defendant cheese makers' conspiracy to depress prices they paid for milk).  The language of the

11 Cartwright Act itself confers this broader scope of "antitrust injury" by permitting suit by any

12 "person who is injured in his or her business or property by reason of anything forbidden or

13 declared unlawful by this chapter … *regardless of whether such injured person dealt directly or*

14 *indirectly with the defendant*."  Cal. Bus. & Prof. Code § 16750(a) (emphasis added).  As a

15 result, "the more restrictive definition of 'antitrust injury' under federal law does not apply" to

16 the Cartwright Act.  Cellular Plus, Inc. v. Superior Court, 14 Cal.App.4th 1224, 1234 (1993).

17 Because Hummer Winblad's allegations meet the standard of the Cartwright Act, Hummer

18 Winblad has standing under California antitrust law independent of its standing under the

19 Sherman Act.  See Cellular Plus, 14 Cal.App.4th at 1234 (affording standing to agents who

20 allegedly lost sales due to prices having been artificially inflated by their principals' price-

21 fixing).

22 **E.   Hummer Winblad Has Standing To Assert Section 17200 Claims**

23        The Labels do not argue that Hummer Winblad fails to allege a substantive Section

24 17200 claim.  Rather, they simply contend that since Hummer Winblad purportedly lacks

25 standing under the Sherman Act, it lacks standing to assert an unfair competition claim based on

26 the same allegations.  But that loses sight of the fact that antitrust standing is distinct from and

27 decidedly stricter than Article III standing.  "A plaintiff who satisfies the constitutional

28 requirement of injury in fact is not necessarily a proper party to bring a private antitrust action."

American Ad Mgmt., Inc. v. Gen. Tel. Co. of California, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999).  By contrast, Section 17200 provides a broad grant of standing to challenge any unlawful or unfair business act or practice.  In federal court, analysis of standing under Section 17200 turns on an analysis of Article III standing.  See, e.g., Levy v. Dial Corp., 1997 WL 588925 at *4 (N.D. Cal. Sept. 10, 1997) (Patel, J.).  But the Labels have not suggested that Hummer Winblad does not satisfy Article III requirements.  Nor could they, since Hummer Winblad has alleged, among other things, a direct and palpable injury to itself arising from the Labels' unlawful and unfair acts and practices.  Thus, a finding that Hummer Winblad lacks antitrust standing would not itself be an obstacle to Hummer Winblad's maintaining its Section 17200 claims in federal court.  Those claims survive the Labels' purely standing-based motion.

### III.   CONCLUSION

Hummer Winblad has standing to assert antitrust injury in the market for online distribution of recorded music, as well as the market for financing online music distribution ventures.  For all the reasons set forth above, the Labels' motion to dismiss Hummer Winblad's antitrust counterclaims should be denied.  At a minimum, Hummer Winblad should be allowed leave to amend its counterclaims to cure any deficiencies the Court may identify.  See Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").


Dated:  October 25, 2004                         KEKER & VAN NEST, LLP



By: /s/ _____
     MARK A. LEMLEY
     Attorneys for Counterclaimants
     HUMMER WINBLAD VENTURE
     PARTNERS IV, L.P.; and HUMMER
     WINBLAD TECHNOLOGY FUND IV,
     L.P.